NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 09a0460n.06

No. 08-3464

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

**FILED**

**Jul 02, 2009**

LEONARD GREEN, Clerk

Igor Nesterov,                                                    )
                                                                 )          ON APPEAL FROM THE
         Petitioner-Appellant,                                   )          BOARD OF IMMIGRATION
                                                                 )          APPEALS
v.                                                               )
                                                                 )                   **O P I N I O N**
Department of Homeland Security, et al.,                         )
                                                                 )
         Respondent-Appellee.                                    )

BEFORE:     CLAY and COLE, Circuit Judges; and CLELAND, District Judge.[*]

**CLELAND, District Judge.** Petitioner-Appellant Igor Nesterov seeks review of the Board

of Immigration Appeals's ("BIA") decision affirming the denial of his application for asylum,

statutory withholding of removal, and protection under the Convention Against Torture ("CAT").

Appellant's claims are rejected and the BIA's decision is affirmed.

**I.**

Petitioner-Appellant Igor Nesterov, a Georgian citizen of Russian heritage, entered the United

States on July 14, 2003, on a B-1 "Business Visitor" visa. (Pet. Br. at 16.) Petitioner's visa

authorized him to remain in the United States until April 12, 2004. (*Id.* at 8.) He did not leave the

United States upon expiration of his visa, but instead waited until March of 2005, at which time he

filed an administrative application for asylum. (*Id.*) Nesterov's application, which includes a

---

[*] The Honorable Robert H. Cleland, United States District Judge for the Eastern District
of Michigan, sitting by designation.

request for withholding of removal for persecution and for protection under the Convention Against Torture (Joint Appendix ("JA") 188), explains his reasons for seeking to avoid removal to Georgia.

Specifically, Nesterov states that his parents are both Russian and that "all of [his] identity documents list [him] as Russian." (JA 197.) He later clarified that, although both he and his parents are citizens of Georgia, his official documentation indicates his nationality as Russian. (JA 93.) Nesterov, in his asylum application and later at his hearing before the immigration judge, provides both abstract and specific evidence as to the generally poor attitude which ethnic Georgians direct towards Russians living in Georgia.

Generally, Nesterov states that Russians in the workforce are prevented from advancing beyond managerial levels. (*Id.*) He also avers "many instances where Russians were attacked" after the Russian army dispersed a Georgian demonstration in 1989. (*Id.*) Further, at Nesterov's hearing, an expert witness[1] testified that "Georgians look down on ethnic Russians as being less educated, less sophisticated culturally, [and] intellectually." (JA 114.) Generally, the expert observed that "there's no state sponsored persecution of Russians in Georgia. There is [sic] various forms of discrimination, mistreatment, [and] violence that is carried out on the (indiscernible) of people who are employed by the state, police agents and this sort of thing. But none of it is sanctioned or being supported." (JA 103.)

Nesterov also provided specific instances of his personal mistreatment by ethnic Georgians. He recounts losing childhood playmates and general harassment by neighbors on account of his

---

[1] The expert witness, Nicholas Breyfogle, is an Associate Professor at the Ohio State University in Columbus, Ohio. (JA 176.) Breyfogle teaches "a range of courses from . . . modern European history, [to] . . . Russian and Eurasian history, and then sort of everything in between." (JA 101.) The government stipulated to Breyfogle's qualification as an expert. (*Id.*)

nationality. (JA 124, 197-98.) Nesterov states that, in 1989, he was beaten by a group of seven Georgian children. (JA 197.) Professionally, even though Nesterov "finished music school with honors [he] could not have a career as a pianist because [he] was Russian." (JA 198.) He was denied other jobs because of his accent.[2] (*Id.*) Nesterov did find a job as a music teacher in 1997, but alleges he was given very few students because of his nationality. (JA 199.)

Nesterov also testified to a number of incidents of violence, or threats of violence, from police officers in Georgia.[3] Nesterov, without providing dates, states that "many times" the police would detain him on the street, "demand money, scream at [him], kick [him] and smack [him] around and then let [him] go." (JA 199.) He describes a particular situation where he "was walking from, from the concert with my friend, Georgian friend. And in a subway policeman stopped us . . . I said I'm Russian. Then . . . he asked about do I have any money in my pocket . . . it was all not official, you know, they didn't make a record, but he started screaming at me . . . very, very bad words . . . he pushed me." (JA 133-134.) At some other time, in "the same situation almost," a police officer "slapped [him] on the face." (*Id.*) Further, Nesterov describes a specific situation that occurred while he was employed as a waiter. (JA 121; 198.) Specifically, he states:

> [I]t was after midnight, two policemans came in a bar, and the kitchen was closed actually, and they said they want to party. And I said, well, we have only drinks and the kitchen is closed. And he says . . . come here. Why you have an accent, are you Russian? . . . I said, yes, I am Russian . . . and they just suddenly, you know, took a gun and put on my, next to my head and tried to push me out, outside to talk to me or with gun in my head.

---

[2]At Nesterov's hearing, the expert witness testified that, even if an ethnic Russian's family had lived in Georgia for generations, it was likely the individual would still have a noticeably non-Georgian accent. (JA 108-109.)

[3]It is unclear from the record whether the police were a local or national force. Nesterov avers that "[a]t times it is hard to tell the difference between the police and the army." (JA 200.)

3

(JA 121-22; 198.)   After the restaurant's owner intervened, Nesterov was able to escape the policemen, but he states the police "kept coming back for several weeks searching for me."  (JA 198.)  Because of the incident, Nesterov was depressed, took medication, and "feared leaving [his] home and did not go outside for a long period of time."  (*Id.*)  Finally, Nesterov admits that, despite these encounters, he was never detained by the police for longer than an hour.  (JA 135.)

Nesterov entered the United States in July of 2003.  In November of that year, Mikheil Saakashvili was elected President of Georgia as a result of the "Rose Revolution."[4]  (Pet. Br. at 16; JA 168.)  Nesterov claims "the newly elected President . . . announced on television in late 2003 that Georgia should get ready for a war with Russia."  (Pet. Br. at 16.)  Nesterov "desired to wait to see if the conditions for ethnic Russians in Georgia would get worse," and so he stayed past his visa expiration date of until April 12, 2004 and waited until March of 2005 to file an asylum application because, at that time, he determined that the situation for ethnic Russians in Georgia was "indeed becoming worse."  (*Id.*)

---

[4]As brief context for the event:

> Georgia became an independent state on April 9, 1991 and, shortly thereafter, Zviad Gamsakhurdia was elected its first president. . . . [I]n December 1991, Gamsakhurdia was overthrown in a bloody coup d'etat, and the country entered into a civil war.  In 1992, Eduard Shevardnadze, a Georgian who had been involved in Soviet politics, joined the leaders of the coup and was soon appointed the interim chairman of the Georgian state council.  When the civil war ended in 1995, Shevardnadze was elected president of Georgia . . . [In November of 2003,] Shevardnadze resigned in a bloodless change of regime known as the "Rose Revolution."

*Gabuniya v. Attorney Gen. of the United States*, 463 F.3d 316, 317, 324 (3d Cir. 2006).  Mikheil Saakashvili came to power as a result.  (JA 168.)

Nesterov was served with a "Notice to Appear" on May 11, 2005, alleging that he had stayed beyond the time permitted by his visa and was thus removable. (Resp. Br. at 5-6.) Nesterov appeared for his hearing on June 21, 2005, and admitted the factual allegations in the "Notice to Appear." (Pet. Br. at 9.)

On July 12, 2006, Nesterov attended a merits hearing before Immigration Judge Thomas G. Snow.[5] (*Id.*) The Immigration Judge ("IJ"), though finding Nesterov to be a credible witness who provided "relatively detailed, plausible, [and] internally consistent" testimony (JA 41), denied his application for asylum and ordered him removed to Georgia. (Pet. Br. at 9.) The Immigration Judge found that Nesterov's application was time-barred and that he had not met his burden of proving past persecution or that it was more likely than not he would be persecuted or tortured in the future. (*Id.*) Upon timely appeal, the Board of Immigration Appeals ("BIA") affirmed the IJ's denial of Nesterov's claims on March 26, 2008. (*Id.* at 12.) Nesterov now appeals. (*Id.* at 15.)

## II.

Title 8 of the United States Code, Section 1252(b)(1) provides this court exclusive jurisdiction to review final orders of removal from the BIA.

## III.

Nesterov appeals the BIA's decision for a variety of reasons. First, Nesterov states that "[a]s reported in Newsweek, News & World Report, and Time . . . Russia launched an invasion of . . . Georgia." (Pet. Br. at 36.) He argues that the conflict "makes a prophet of [Nesterov] who predicted that there would be such a war during his testimony at the merits hearing" and that the event makes

---

[5]During the merits hearing, Nesterov was physically present in Cincinnati, Ohio and intereacted with the Immigration Judge, who was physically located in Arlington, Virgina, via videoconference.

it more likely than before that Nesterov will suffer persecution if removed to Georgia. (*Id.*) As a result, Nesterov asks the court to take judicial notice of the conflict and remand the matter for further factual findings.

Nesterov provides no legal basis for this type of remand, and there is no statutory basis for this court to remand where a petitioner seeks to only supplement the record. *Fang Huang v. Mukasey*, 525 F.3d 640, 656 (6th Cir. 2008). In fact, Congress has "explicitly revoked [the court's] authority to remand to the BIA for the taking of additional evidence." *Id.* (quoting *Xiao Xing Ni v. Gonzales*, 494 F.3d 260, 264-65 (2d Cir. 2007)). A procedure does exist, however, under which a petitioner may file a motion to reopen, with the BIA, "within 90 days of the date of entry of a final administrative order of removal." *Lindor v. Holder*, No. 08-3019, 2009 WL 706456 at *3 (6th Cir. Mar. 18, 2009) (quoting 8 U.S.C. § 1229a(c)(7)(C)(i)). If, as here, a petitioner is beyond the ninety day time limit, an exception may exist where the motion "is based on changed country conditions arising in the country of nationality or the country to which removal has been ordered, if such evidence is material and was not available and would not have been discovered or presented at the previous proceeding." 8 U.S.C. § 1229a(c)(7)(C)(ii). Thus, and although we possesses an inherent equitable power to remand a matter for fact-finding in some situations, *Fan Huang*, 523 F.3d at 656, where the basis for remand is an instruction to consider new evidence previously not in the record and there are procedures already in place to do so, it is inappropriate for the court to exercise its equitable power. *Id.*

The exact situation is present here. Nesterov seeks to have this court remand the matter for further factual findings in light of the military conflict. We would be issuing a directive to the BIA to consider new evidence not previously in the record, and it would be doing so while ignoring the

6

procedure for a motion to reopen as detailed under 8 U.S.C. § 1229a(c)(7)(C)(i). With explicit statutory direction to do otherwise, and in light of the clear remedy available to Nesterov, the court will not now remand the matter for further factual finding as to the recent Russian-Georgian conflict.

## IV.

Nesterov also disputes that his application for asylum is time-barred and argues this court has jurisdiction to review his claim. The IJ found that Nesterov "failed to file his asylum application within one year of his entry into the United States." (JA 42.) The BIA affirmed the decision that the application was time-barred. (Pet. Br. at 13.) It is clear that we cannot review asylum applications, denied for untimeliness, when the appeal seeks only review of discretionary or factual questions. 8 U.S.C. § 1158(a)(3); *Castellano-Chacon v. Immigration & Naturalization Serv.*, 341 F.3d 533, 544 (6th Cir. 2003). When a petitioner "seeks review of constitutional claims or matters of statutory construction," however, this court does have jurisdiction to consider the appeal. *Almuhtaseb v. Gonzales*, 453 F.3d 743, 748 (6th Cir. 2006). Further, the constitutional right to procedural due process, as guaranteed under the Fifth Amendment to the United States Constitution, applies to aliens in a removal hearing. *Zadvydas v. Davis*, 533 U.S. 678, 693-94 (2001); *Alshareqi v. Mukasey*, 295 F. App'x 2, 6 (6th Cir. 2008).

Here, Nesterov argues that the IJ's "poorly reasoned decisions which lack clear administrative findings" violated his constitutional right to procedural due process. (Pet. Br. at 37.) Nesterov details a variety of events which he claims denied him a fair hearing. (*Id.*) Because Nesterov argues for review of a constitutional claim – his right to a full and fair hearing – the court does have jurisdiction to the extent required to evaluate the procedural due process afforded Nesterov.

Nesterov alleges that he was denied procedural due process during the consideration of his application for asylum, as reflected in the IJ's decision and the BIA's affirmance of that decision. We review *de novo* alleged due process violations by either an IJ in conducting a hearing, or in the BIA in reviewing such a hearing. *Mikhailevitch v. Immigration & Naturalization Serv.*, 146 F.3d 384, 391 (6th Cir. 1998); *Pepaj v. Mukasey*, No. 06-3491, 2009 WL 129569 at *5-6 (6th Cir. Jan. 21, 2009). "A violation of due process occurs when the proceeding was so fundamentally unfair that the alien was prevented from reasonably presenting his case." *Hassan v. Gonzales*, 403 F.3d 429, 436 (6th Cir. 2005) (internal quotation omitted). Thus, if an asylum-seeker is provided "a reasonable opportunity to examine the evidence against him, to present evidence on his own behalf, and to cross-examine witnesses presented by the Government," due process is not violated. *Mikhailevitch*, 146 F.3d at 391 (quoting 8 U.S.C. § 1252(b)(3)).

1. *The Immigration Judge's Order*

Nesterov states that he testified at his merits hearing before the IJ that, instead of filing his application for asylum on time, he was waiting to see if the situation in Georgia would "get worse" for Russians. (Pet. Br. at 40.) He argues that the IJ misconstrued Nesterov's intent and based his decision on the fact that Nesterov was waiting to see if the situation "would improve." (*Id.*; JA 42.) The court finds this argument in semantics to be entirely unconvincing as it amounts to nothing more than an experiment in "half full versus half empty" language and does not demonstrate a due process violation. Nesterov also points to the IJ's statement that "[Nesterov] entered the United States in July of 2003, and was authorized to stay until April of 2004, yet he still failed to file for asylum until March of 2005." (Pet. Br. at 40.) Nesterov claims that, because the new "fiercely anti-Russian" regime took power in Georgia in November of 2003, the IJ could not have "decid[ed] if an

8

application is filed within a reasonable time if one of the critical dates [was] not stated." (*Id.*) This is not a due process violation. The IJ's lengthy opinion shows that he received testimony and considered all the critical dates in the matter. He stated that Nesterov's testimony did not "constitute changed or extraordinary circumstances justifying the late filing." (JA 42.) The simple fact that he did not list every date in his explanation does not show that Nesterov was denied a full and fair hearing.[6] Finally, Nesterov claims that because of transmission difficulties during the video conference with the IJ during the merits hearing, that his procedural due process rights were violated. This argument was not presented to the BIA, and thus this court is without jurisdiction to consider it.[7] *Ramani v. Ashcroft*, 378 F.3d 554, 558 (6th Cir. 2004); *Luca v. Mukasey*, 259 F. App'x 701, 708 (6th Cir. 2007).

### 2. Board of Immigration Appeals

Nesterov also points to three "errors" the BIA made in reviewing the IJ's denial of his application. First, Nesterov argues the BIA relied upon a 2006 Department of State Country Report of Human Rights Practices, while the critical events occurred during the period from 2003 to 2005. (Pet. Br. at 38.) The BIA used the 2006 report to document improvements for Russians living in Georgia since 2003, not for an "irrational" conclusion as Nesterov alleges. More importantly, the use of the report does not demonstrate that Nesterov was denied due process. Nesterov also argues that the BIA's conclusion that the expert witnesses contradicted Nesterov's argument "mis-stated

---

[6]Nor does Nesterov's brief now explain why he could not have filed his application in a timely manner, beyond that he was waiting to gauge the situation. The changed circumstances, as he points out, occured in November of 2003. His visa allowed him to remain until April of 2004. The application was filed in March of 2005.

[7]Nesterov does not address the exhaustion issue, as raised by Respondent (Resp. Br. at 23-24), in his reply and may have abandoned it.

9

and mischaracterized" the expert's testimony. Specifically, Nesterov avers that the BIA considered the expert's view on conditions within Georgia in 2003 to 2004, while Nesterov claims the expert testified at the merits hearing only as to the Georgian government's policies in 2006. (Pet. Br. at 39.) In fact, the BIA noted that the expert testified only to improvements the Georgian government was making on an on-going basis. (JA 5.) We can discern no contradiction. Finally, Nesterov argues that the BIA, in noting that the Georgian government was taking steps to improve the situation for Russians, ignored testimony that there was still a "serious, serious problem." (Pet. Br. at 39.) Again though, the BIA quoted, and considered, the IJ's remark that there were continuing issues for Russians in Georgia. *See* JA 6 ("'I'm not in any way ignoring the fact that both [the expert witness] and the Country Report for Georgia . . . indicate that there are continuing human rights related problems in that country.'") The court cannot conclude that any mischaracterizations or misuses of evidence exist in the manner Nesterov alleges. More importantly, even if contradictions existed, this court finds that they do not rise to the level of a review by the BIA that was so "fundamentally unfair that the alien was prevented from reasonably presenting his case." *Hassan,* 403 F.3d at 436. Thus, we deny Nesterov's due process claims.

## V.

Petitioner also argues that any tardiness in his filing an application for asylum should be excused because of "changed circumstances" in Georgia. (Pet. Br. at 42.) "The existence of 'changed circumstances' that materially affect eligibility for asylum is a predominately factual determination, which will invariably turn on the facts of a given case." *Almuhtaseb*, 453 F.3d at 748 (quotation omitted). Thus, unlike a constitutional claim such as due process, we are barred from

review. *Id.* Therefore, this court affirms the BIA's ruling as to changed circumstances excusing Nesterov's late application filing.[8]

## VI.

Turning to Nesterov's argument for withholding of removal, he argues, in conclusive fashion, that he has "sustained his burden of proof required to establish he was more likely than not to suffer persecution at the hands of the Georgian police on account of his Russian ethnicity." (Pet. Br. at 48.) An applicant seeking withholding of removal faces "a more stringent burden than what is required on a claim for asylum." *Khalili v. Holder*, 557 F.3d 429, 435 (6th Cir. 2009) (quotation omitted). The applicant must show a "clear probability" of persecution if forced to return to the country of removal, *id.*, which means he must prove it is "more likely than not" he will be persecuted upon return. *Katabarwa*, 193 F. App'x 519, 525 (6th Cir. 2006). The BIA defines persecution as "the infliction of harm or suffering by the government, or persons the government is unwilling or unable to control, to overcome a characteristic of the victim." *Khalili*, 557 F.3d at 436 (quotation omitted).

Where, as here, the BIA has reviewed the IJ's decision and issued a separate opinion, we review the BIA's decision as the final agency determination. *Id.* at 435 (citing *Morgan v. Keisler*, 507 F.3d 1053, 1057 (6th Cir. 2007)). This court also reviews the IJ's decision to the extent the BIA adopted the reasoning, and questions of law are reviewed *de novo*, with substantial deference paid to the BIA's interpretation of the INA and accompanying regulations. *Khalili*, 557 F.3d at 435. Both the IJ's and the BIA's factual findings are reviewed using the substantial evidence standard, under

---

[8]Because we do not review the changed circumstances, or the other merits, of Petitioner's tardy asylum application, the court will not consider his "*in arguendo*" argument to do so. (Pet. Br. at 43-48.)

11

which the court cannot reverse simply because this court may have decided differently. *Id.* (citing *Gishta v. Gonzales*, 404 F.3d. 972, 978 (6th Cir. 2007)).

Here, both the IJ and the BIA analyzed, in detail, the various instances of Nesterov's poor treatment at the hands of Georgian police. On more than one occasion, he was briefly detained, slapped, pushed, and extorted for money. (JA 6, 34-35.) In one instance, he was held, by police, at gunpoint for a matter of minutes. (JA 35.) The expert witness at the hearing testified that there was no state sponsored persecution of Russians in Georgia, but that there is general discrimination and mistreatment. (JA 37.) By every indication, all testimony, including the events of Nesterov's mistreatment, was considered by both the IJ and the BIA and found not to establish a clear probability that Nesterov faced persecution upon his return to Georgia. As the IJ found, the events "do show some continuing human rights problems in Georgia, including some regrettable discrimination and abuse against ethnic minorities." (JA 44.) But, as the BIA stated upon affirming the IJ's decision, "the alleged incidents of discrimination and harassment, even taken together, do not rise to the level of persecution." (JA 6.)

We agree. Nesterov has faced unfortunate instances of violent behavior on several occasions. But he offers no evidence that the Georgian government is unwilling or unable to control the long-standing prejudice held by some Georgian police officers. Indeed, the record evidence shows otherwise – that the government has taken steps to curb these types of abuses and has had some success in doing so. *See* JA 103, 105 ("I do think that the [current Georgian] government has made great strides [to curb discrimination.]. . . I think they are making a reasonable effort to try to curb these things."). Even Nesterov's most troubling allegation, that a police officer once held a gun to his head and ordered him out of a restaurant (JA 198), has been found by this court to be insufficient

12

to establish a clear probability of future persecution. *Sulaj v. Mukasey*, 287 F. App'x 481, 484, 498 (6th Cir. 2008). Sadly, Nesterov has endured "a few incidents of physical mistreatment brief in duration and of limited severity." *Id.* at 489. The IJ took pains to make clear that he was "not in any way ignoring the fact that both [the expert witness] and the Country Report for Georgia . . . indicate that there are continuing human rights related problems in that country" (JA 6), but the poor situation sometimes experienced by Russians in Georgia does not legally constitute persecution. As such, we affirm the BIA's decision and deny Nesterov statutory withholding of removal.

**VII.**

Finally, Nesterov argues that the single incident in which a police officer "unlawfully detained and interrogated [Nesterov]" and pointed a gun at his head establishes that it is more likely than not he will face torture if returned to Georgia. He asks the court to remand the matter to the BIA for further factual and legal findings regarding his CAT claim. Torture, as defined in the CAT, is:

> any act by which severe pain or suffering, whether physical or mental, is intentionally inflicted on a person for such purposes as obtaining from him or her or a third person information or a confession, punishing him or her for an act he or she or a third person has committed or is suspected of having committed, or intimidating or coercing him or her or a third person, or for any reason based on discrimination of any kind, when such pain or suffering is inflicted by or at the instigation of or with the consent or acquiescence of a public official or other person acting in an official capacity.

*Ali v. Reno*, 237 F.3d 591, 597 (6th Cir. 2001) (quoting 8 C.F.R. § 208.18(a)(1)). If a single incident of a brief detention at gunpoint does not establish a threat of future persecution, *Sulaj,* 287 F. App'x at 498, this court cannot conclude such an incident constitutes a future threat of

13

torture. Perhaps more importantly, though, Nesterov offers no legal authority for the court to remand his CAT claim for "additional factual and legal findings." (Pet. Br. at 50.) As noted in section III, *supra*, there is a "lack [of] a statutory basis for remanding [Nesterov's] case or for supplementing the record." *Huang*, 523 F.3d at 656. Nesterov had ample opportunity to testify and present evidence regarding his CAT claim before the IJ and upon appeal to the BIA. We now deny his request to remand for further factual and legal development.

## VIII.

For the reasons provided above, we affirm the Board of Immigration's decision and deny Igor Nesterov's petition for asylum, withholding of removal, and protection under the Convention Against Torture.